MR. JUSTICE HUNT,
concurring:
I concur with the majority opinion concerning the jury instructions given by the Court and I concur in the reversal of the action on that basis. However, I do not agree with the majority that the facts are as clear as they present them.
My review of the record indicates that the article contains errors and omissions, and in the final analysis proved to be false. However, the fact that the article ultimately proved to be false does not change my belief that Sible has failed to clearly and convincingly prove that the article was published with actual malice. As stated in New York Times Co. v. Sullivan (1964), 376 US. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.
“The constitutional protection does not turn upon ‘the truth, popularity, or social utility of the ideas and belief which are offered.’ (Citation omitted.)
“[E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the ‘breathing space’ that they ‘need ... to survive . . .’ (Citation omitted.)”
376 U.S. at 271-72, 84 S.Ct. at 721, 11 L.Ed.2d at 701.
*170 Montana is also committed to the notion that freedom of expression should be as broad and unfettered as possible recognizing such freedom must be weighed against an individual’s right of privacy and reputation. 1972 Mont. Const., Art. II, Section 7; Cox v. Lee Enterprises (Mont. 1986), [222 Mont. 527,] 723 P.2d 238, 43 St.Rep. 1476.
Sible raises a number of errors and omissions in the article, but especially finds fault with respondents’ failure to adequately investigate the story, and with the use of the words “theft” and “coverup.” Investigatory failures alone are insufficient to establish reckless disregard of the truth. Instead, Sible must show that the respondents’ conduct was highly unreasonable and constituted “an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.” Curtis Publishing Co. v. Butts (1967), 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111.
Here, while respondents’ investigation could have been more thorough, it was not so unreasonable as to constitute an extreme departure from responsible publishing standards.
Prior to his work on this story, Schwennesen had never met Salisbury, and knew Sible only by appearance. Sible testified he did not believe Schwennesen or anyone else at The Missoulian was “out to get him.” Schwennesen interviewed all the major participants involved except one, a deputy named Christian. He attempted to contact Christian twice but he was on vacation. Schwennesen did not contact Christian after he returned from vacation because by that time, Sible had admitted to Schwennesen that he had the smoker. The Missoulian also consulted with its legal counsel prior to publication.
Schwennesen testified that Salisbury appeared to be candid, forthright, and “sincerely believed what he was telling” him. Further, Schwennesen verified the majority of facts in the story. He confirmed that the smoker was missing and that Sible admitted having it in his possession. Salisbury’s investigation into the matter was authorized by Sheriff Rierson who later put Sible in charge of the detective division. Salisbury’s subsequent reprimand, transfer to patrol, and ultimate resignation were verifiable facts. I do not agree that respondents’ investigatory failures were so extreme as to amount to reckless disregard of the truth.
Sible argues respondents’ use of the words “theft” and “cover-up” in the article constitutes reckless disregard of the truth. None of the *171 sources for the story used those words and Sible argues their use by Schwennesen amounted to fabrication and publication of a known falsehood. I do not agree.
The owner of the smoker, Eckerson, told Schwennesen that he had seen a smoker that looked like his on property he believed to be Sible’s. Eckerson further testified that he thought Sible had taken his smoker, but did not want to make an issue of it. In Salisbury’s notarized statement which Schwennesen read, he states that a man, Eckerson, told him Sible “stole his smokehouse.” Salisbury went to Sible’s residence and “located the smokehouse.” Although no one used the word “theft,” it was implied from the statements and interviews Schwennesen had prior to publication.
The use of the word “cover-up” derived from the fact that after Sible was placed in charge of the detective division, Salisbury was reprimanded for failure to solve cases and his demeanor with female complainants. He later transferred to the patrol division and ultimately resigned.
I do not agree that respondents acted in reckless disregard of the truth in using the words “theft” and “cover-up.” Instead, the article was based upon interviews with the major participants and probable conclusions from verified facts.
Furthermore, I do not believe Schwennesen waived the shield law as set out in Section 26-1-902, MCA, by taking the stand.
Schwennesen was named defendant in this action. He did not file a counterclaim or a cross-claim, but did take the stand in his own defense. He testified in great detail as to the circumstances involving preparation of the article. However, at no time did Schwennesen offer to introduce any portion of his notes into evidence, nor did he refer to his notes in his testimony to refresh his recollection or bolster his testimony. I cannot agree that Schwennesen ever “voluntarily offered” to produce or testify concerning the contents of his notes.
The case of Lal v. CBS, Inc. (E.D.Pa. 1982), 551 F.Supp. 364, Aff’d (3d Cir.1984), 726 F.2d 97 is similar. In that case, a federal district court judge held a reporter’s notes privileged under Pennsylvania’s shield law even though the reporter had already revealed her primary sources. In this case, Schwennesen revealed his sources and testified concerning preparation of the article. He did not voluntarily testify concerning his notes or their contents.
Section 26-1-902, MCA, was written to encourage a free and dynamic press by protecting journalists and related media personnel *172 from compelled disclosure of sources and confidential information. It is our duty to uphold legislative intent whenever possible. Therefore, I would conclude that the District Court was correct in refusing to compel production of Schwennesen’s notes.
Because I agree that the jury was not properly instructed as to actual malice, I concur with the majority in reversing and remanding for new trial.